**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | ) MDL No.<br>) 2:18-mn-2873-RMG<br><br>**C.A. No.: 2:24-cv-02321-RMG** |
| CITY OF CAMDEN, CALIFORNIA WATER SERVICE COMPANY, CITY OF BENWOOD, CITY OF BROCKTON, CITY OF DELRAY BEACH, CITY OF FREEPORT, CITY OF SIOUX FALLS, CITY OF SOUTH SHORE, CORAOPOLIS WATER & SEWER AUTHORITY, DALTON FARMS WATER SYSTEM, MARTINSBURG MUNICIPAL AUTHORITY, TOWNSHIP OF VERONA, AND VILLAGE OF BRIDGEPORT, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>-*vs*-<br><br>TYCO FIRE PRODUCTS LP, individually and as successor in interest to The Ansul Company, and CHEMGUARD, INC.<br><br>*Defendants.* | )<br>)<br>) **CLASS ACTION**<br>) **COMPLAINT**<br>)<br>) **Jury Trial Demanded**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Plaintiffs CITY OF CAMDEN, CITY OF BENWOOD, CITY OF BROCKTON, CITY OF SIOUX FALLS, CALIFORNIA WATER SERVICE COMPANY, CITY OF DELRAY BEACH, CITY OF FREEPORT, CITY OF SOUTH SHORE, CORAOPOLIS WATER & SEWER AUTHORITY, DALTON FARMS WATER SYSTEM, MARTINSBURG MUNICIPAL AUTHORITY, TOWNSHIP OF VERONA, AND VILLAGE OF BRIDGEPORT (collectively "proposed Class Representatives"), by and through their attorneys Baron & Budd P.C., Douglas

& London P.C., Napoli Shkolnik and Motley Rice LLC (collectively "proposed Class Counsel"), for their Class Action Complaint against Defendants Tyco Fire Products LP ("Tyco") and Chemguard, Inc. ("Chemguard") (collectively "Defendants"), allege on behalf of themselves and others similarly situated as follows:

## INTRODUCTION AND BACKGROUND

1. The proposed Class Representatives are public water entities and/or private companies that provide drinking water to the public ("Public Water Systems"), and they bring this class action lawsuit on behalf of themselves and other similarly situated Public Water Systems (the "proposed Class Members") arising from the widespread contamination of drinking water supplies by per- and polyfluoroalkyl substances ("PFAS"), a family of chemical compounds that includes perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS").

2. The proposed Class Representatives and proposed Class Members supply drinking water to tens of millions of individuals and businesses nationwide. The proposed Class Representatives own and/or operate public drinking water supply systems, which include groundwater supply wells and surface waters, that supply water to residences, schools, and businesses. These drinking water supplies have been contaminated with PFAS. The proposed Class Representatives seek to represent all similarly situated owners and/or operators of drinking water supplies that have likewise been contaminated with PFAS.

3. Tyco is the successor-in-interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990.

4. Beginning in or around 1975, Ansul designed, manufactured, marketed, distributed, and sold aqueous film-forming foam ("AFFF") containing PFAS.

5.      After Tyco acquired Ansul in 1990, Tyco continued to design, manufacture, market, distribute, and sell AFFF products containing PFAS.

6.      In 2011, Tyco acquired Chemguard, a fluorosurfactant and AFFF manufacturer, which had been selling AFFF into the marketplace since approximately 1988.

7.      Defendants manufactured AFFF, which is a firefighting agent used for training and to control and extinguish Class B fuel fires, that was distributed to and/or sold at military and civilian airports and to municipal fire departments throughout the United States.

8.      Defendants developed, manufactured, formulated, distributed, and/or sold AFFF products containing PFAS for use by its customers with the knowledge that PFAS compounds would be released into the environment during fire protection, training, and response activities, even when the AFFF was used and disposed of as directed and instructed by Defendants.

9.      Defendants were aware that the PFAS in their AFFF are toxic, bioaccumulative, do not biodegrade, move readily through soil and groundwater, and pose a significant risk to human health and safety.

10.     Defendants were aware that Defendants' AFFF products containing PFAS would be used, released, stored, and/or disposed of at, near or within the vicinity of the drinking water supplies of the proposed Class Representatives and proposed Class Members, and that they would enter the environment, migrate through the soil, sediment, stormwater, surface water, and groundwater, thereby contaminating or threatening to contaminate the drinking water supplies of the proposed Class Representatives and proposed Class Members.

11.     Nevertheless, Defendants elected to develop, manufacture, formulate, distribute and sell their AFFF products containing PFAS, thereby placing profits over human health and the environment.

12.    At all relevant times, Defendants' PFAS-containing AFFF was used and stored at fire training facilities, fire departments, airports, and military bases for fire protection, training, and response activities. During these activities, Defendants' AFFF products containing PFAS was used as directed, instructed, and intended by Defendants, which allowed PFAS to leach into the air, soil, and groundwater, thereby contaminating the drinking water supplies of the proposed Class Representatives and proposed Class Members.

13.    The proposed Class Representatives bring this action, individually and on behalf of all others similarly situated, against Defendants to recover any and all relief with respect to the installation, maintenance and operation of, and cost associated with, any kind of treatment, filtration, remediation, testing, or monitoring of the ongoing contamination of their drinking water supplies proximately caused and/or created by Defendants' AFFF products containing PFAS, as well as any and all damages available as a result of the actions and/or inactions of Defendants, and to ensure that Defendants, as the responsible parties, bear such expense, rather than the proposed Class Representatives and proposed Class Members.

14.    The proposed Class Representatives seek to recover by this action the substantial costs necessary to protect the public and restore their damaged drinking water supplies as well as those of other similarly situated Public Water Systems. These costs include, but are not limited to, the costs of testing and monitoring water supplies for PFAS contamination; the costs of designing, constructing, installing, operating and maintaining the treatment facilities and equipment required to comply with state and federal safe drinking water laws and to remove PFAS from the drinking water supplied to the public; and/or the costs of securing alternative sources of water as a result of PFAS contamination.

## JURISDICTION AND VENUE

15.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §

1332 (d) because there is minimal diversity of citizenship among the parties, there are more than

100 members of the proposed Class, and the amount in controversy exceeds the sum or value of

$5,000,000 exclusive of interest and costs.

16.      Venue is appropriate in this District pursuant to the Order of the Judicial Panel on

Multidistrict Litigation which transferred and centralized all related action in this Court for

coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C § 1407.

17.      Case Management Order No. 4 authorizes direct filing of the claim to this judicial

district.

## PARTIES

**A.      Proposed Class Representatives for the Proposed Class**

18.      **Plaintiff City of Camden ("Camden")** is located in Southeast New Jersey, in

Camden County, with a population of approximately 72,000. Camden provides drinking water to

all residents of the City of Camden, comprising approximately 13,666 metered accounts.

19.      Camden's system consists of 19 wells that draw from the lower Potomac Raritan-

Magothy (PRM) Aquifer. The system has a maximum pumping rate of 27,600 gallons per minute.

The 19 wells are spread across four wellfields in the City of Camden.  As of May 2023, 17 of the

19 wells were active and, of these 17 active wells, 10 have been taken out of service due to PFAS

contamination, which is believed to have resulted from firefighting training activities by the City

of Camden's fire department.

20.      Camden's system utilizes two treatment plants, which treat ground water for iron

and manganese removal by oxidation, settling and filtration. Volatile organic chemicals are

removed via packed tower aeration. All treated water is disinfected with chlorine to maintain

water quality in the distribution system.  Fifteen (15) of the groundwater wells are treated at the Morris-Delair Water Treatment Plant and two wells are treated at the Parkside Water Treatment Plant. Aside from PFAS, no other regulated contaminants have been detected in the City of Camden's drinking water supply at levels above the relevant MCLs.

21.     PFAS were first detected in the City of Camden's water supply in January 2018. The highest level of PFOA detected has been 163.9 ppt and the highest level of PFOS detected has been 75.2 ppt.

22.     In January 2020, the City of Camden removed six wells with significantly elevated levels of PFAS from service. Continued PFAS testing in 2020 revealed additional contamination and four (4) other wells were taken off-line.

23.     With these wells off-line, it was necessary to supplement the City's water supply for the following several years until adequate treatment could be installed to treat the water from Morris and Delair wellfields for PFAS. The City of Camden therefore entered into a 10-year Commodity Demand Water Supply Agreement ("CDWSA") with New Jersey-American Water to meet these needs. The City of Camden purchased 3.0 million gallons per day ("MGD") in 2021 and 2.5 MGD in 2022.  The City of Camden is paying approximately $300,000 per month for the purchased water.

24.     The City of Camden has installed a granulated activated carbon ("GAC") filtration system to remove PFAS at the Parkside Treatment Plant and is in the planning phase for the implementation of PFAS treatment at the Morris-Delair Plant.

25.     **Plaintiff California Water Service Company ("Cal Water")** is a California public utility water corporation incorporated under the laws of the State of California, with its principal place of business in San Jose, California.

26.     Cal Water owns and operates public drinking water systems that provide potable drinking water to residents and businesses in various locations throughout California, including but not limited to Bakersfield, Bakersfield-North Garden, Marysville, Salinas, Selma, South San Francisco, Stockton, Tulco and Visalia. Each of these systems is subject to the rules and regulations of the California Public Utilities Commission, and with respect to each such system, Cal Water has a certificate of convenience and necessity pursuant to which Cal Water has a duty to provide water service.

27.     Each of these water systems includes, among other elements, drinking water production wells that draw from groundwater aquifers and associated pumping, storage, treatment and distribution facilities and equipment. Among other things, Cal Water has the right to appropriate and use groundwater for drinking water supplies from such wells.

28.     Cal Water's water supply is contaminated with PFAS.

29.     **Plaintiff City of Benwood ("Benwood")** is located in Marshall County, West Virginia, and has a population of approximately 1,245 residents. Benwood's water system provides water services to a population of approximately 1,510.  Benwood's water supply comes from two groundwater wells. The source wells are located in the Alluvial Valleys Area of West Virginia. Total raw water production is approximately 175,000 GPD.

30.     Benwood first became aware of PFAS contamination through testing conducted by the United States Geological Survey (USGS) between 2019 and 2021. Further testing was conducted by the State of West Virginia in 2022. Over the course of testing, PFAS, including PFOS, PFOA, PFHxS, and PFBS, were detected in Benwood's water system.  PFOS results ranged from 8.56 to 14 ppt and PFOA was 5.3 ppt.

31.    **Plaintiff City of Brockton ("City of Brockton")** is located in Plymouth County, Massachusetts, and is the owner and operator of the Brockton Water Department ("BWD"). The BWD is a Public Water System currently serving approximately 23,000 active water service accounts, over 3,000 hydrants and over 5,500 valves in the City of Brockton, Towns of Avon, Hanson, Halifax, Pembroke, and Whitman.

32.    The BWD obtains water from Silver Lake and the Brockton Reservoir. Silver Lake is the primary supply (88.25% of total) and is located approximately 15 miles southeast of the center of Brockton. Over 50% of the watersheds are either owned by the City of Brockton or in conservation protection. Water from the lake is treated at the Silver Lake Water Treatment Plant ("SLWTP") and is transmitted through two 24-inch diameter mains to Brown's Crossing Pumping Station. After Brown's Crossing, the water is pumped through one 36-inch diameter, and two 24-inch diameter, transmission mains to the Brockton service system. The Brockton Reservoir is a supplemental supply (5.51% of total) to Silver Lake and is blended into the system at Woodland Avenue.[1]

33.    Beginning in 2020, the City of Brockton started testing the water for PFAS under the Massachusetts Department of Environmental Protection's guidance. Testing at that time showed PFAS6[2] levels totaling 28 ppt from a water sample taken at the Brockton Reservoir.

---

[1] The BWD purchased the remaining 6.24% of its water from Aquaria.

[2] The six PFAS are: PFOS, PFOA, PFHxS, PFNA, PFHpA, and PFDA. MassDEP abbreviates this set of six PFAS as the "PFAS6" and has used them to set a drinking water standard meant to be protective against adverse health effects for all people consuming the water. *See* https://www.mass.gov/info-details/per-and-polyfluoroalkyl-substances-pfas#:~:text=Drinking%20Water%20Standards%20and%20Health%20Information,-Massachusetts%20PFAS%20Standard&text=The%20six%20PFAS%20are%3A%20PFOS,all%20people%20consuming%20the%20water (*last accessed* on April 17, 2024) (https://perma.cc/89JR-BUPP).

Subsequent testing performed at the Brockton Reservoir reported high levels of PFAS6 at 28ppt. The City of Brockton also performed water testing on November 18, 2021, showing PFAS6 levels of 35.63 ppt in finished water and 40.33 ppt in raw water at the Brockton Reservoir and the Woodland Avenue Water Treatment Plant.

34.     The City of Brockton took the Brockton Reservoir out of service and is currently purchasing water from the Aquaria Desalination Plant to comply with their water supply demands. While removed from service, upgrades were completed at the Woodland Avenue Water Treatment Plant. Upgrades included replacing both filter carbons with new granular activated carbon which are designed to reduce PFAS6 from the water. The City of Brockton is following the guidance and testing requirements of the Massachusetts Department of Environmental Protection as it pertains to PFAS.

35.     **Plaintiff City of Delray Beach ("City of Delray Beach")** is located in Florida and is the owner and operator of a Public Water System serving approximately 68,000 residents with 22,000 service connections. The City of Delray Beach withdraws water from a shallow underground source called the east coast surficial aquifer, a 75- to 195-feet deep underground aquifer. There are 30 raw water wells located throughout the City of Delray Beach from which water is drawn and piped to the water treatment plant. The Surficial Aquifer system in Florida includes any otherwise undefined aquifers that are present at land surface. It is made up of mostly unconsolidated sand, shelly sand, and shell. The aquifer thickness is typically less than 50 feet but can range up to 400 feet in Indian River and St. Lucie Counties. The City of Delray Beach is currently operating under a water use permit issued by the South Florida Water Management District. The water use permit allows for the withdrawal of up to 19.1 million gallons per day.

36.     In August 2020, the City of Delray Beach voluntarily started testing for PFAS in its water system. This testing showed PFAS in all of its wells. PFAS levels ranged between 25.3 ppt to 92 ppt. Since 2020, the City of Delray Beach has been committed to regular testing for PFAS and continues to provide transparency of the process to its customers. Their most recent PFAS testing from June 13, 2022, continues to show PFAS contamination.

37.     The City of Delray Beach has paid an excess of $25,000 for PFAS testing. It is currently working on a project to construct a new water treatment plant. The new water treatment plant is meant to replace or complement the existing aged conventional lime-softening plant and it will have a Nanofiltration system to remove PFAS. Also, it will be designed and constructed to meet all the latest regulatory requirements of the Environmental Protection Agency ("EPA"); the Florida Department of Environmental Protection and the Florida Department of Health. The new water treatment plant is projected to be online in late 2026 and has an approximate cost of $100 million.

38.     **Plaintiff City of Freeport ("Freeport")** is the owner and operator of a water system serving approximately 25,000 residents located in and around the City of Freeport, Illinois. Currently, Freeport's system draws the drinking water it provides to customers from four groundwater wells. Two other wells that used to produce 75% of the city's water have been abandoned due to PFAS contamination.

39.     **Plaintiff City of South Shore ("South Shore")** is located in Northeastern Kentucky in Greenup County and provides drinking water to a population of approximately 6,800 with approximately 2,069 residential and commercial customer connections.

40.     South Shore's drinking water system is comprised of eleven wells.  South Shore also purchases water from nearby public water suppliers to augment its groundwater well supply.

The system has a total annual flow of 96,008,000 and an average 8,000,000 gallons used per month.

41.    PFAS were first detected in South Shore's wells in February 2020.  The highest level of PFOA detected was 72.10 ppt and the highest level of PFOS detected was 248 ppt.  All of the South Shore's wells were shut down due to PFAS contamination and South Shore now purchases 100% of its drinking water from Portsmouth, Ohio via a temporary water line that is laid across a bridge.  South Shore is currently in the design process to make this line permanent by burying it under the Ohio River.

42.    **Plaintiff City of Sioux Falls ("Sioux Falls")** is a municipal corporation and public water provider, existing under the laws of the State of South Dakota, with its primary address at 231 N. Dakota Avenue, Sioux Falls, South Dakota, 57104.  Sioux Falls supplies drinking water to customers in Minnehaha and Lincoln Counties and in the City of Sioux Falls. The drinking water is obtained in part from groundwater wells that draw from the Big Sioux Aquifer. Sioux Falls has a property interest in the water it appropriates, treats, stores, and distributes to the public as well as in its wells, piping, distribution system, and water treatment facilities.

43.    At least 20 of Sioux Fall's wells are contaminated with PFOS and PFOA, which is believed to have resulted from firefighting training, protection and response activities by the Sioux Fall's fire department.

44.    **Plaintiff Coraopolis Water & Sewer Authority** ("Coraopolis") is a municipal corporation organized pursuant to laws of the Commonwealth of Pennsylvania.

45.    Coraopolis operates a Public Water System that draws drinking water from eight groundwater wells located near the Ohio River, and serves 2,574 metered residential, commercial,

industrial and municipal accounts in the Borough of Coraopolis and a small portion of Moon Township in western Pennsylvania.

46.    Coraopolis has detected PFAS compounds in sampling from all four of its groundwater wells.

47.    **Plaintiff Dalton Farms Water System ("DFWS")** is currently owned and operated by Dutchess County Water and Wastewater Authority ("DCWWA"), which currently owns and operates 13 water systems (including DFWS), 6 sewer systems, and one water transmission system located within 10 different municipalities, collectively serving over 5,500 residential and commercial customers.

48.    The DFWS serves 2,055 residents through 603 service connections. The DFWS operates its own water system that contains four drilled wells on the northerly side of Recreation Road. The DCWWA tested the DFWS wells and results indicated that well #5A has detectable amounts of PFOS that range from ND-8.51 ppt and PFOA that range from 1.8 ppt to 30.5 ppt. These wells are located 1.5 miles from the Beekman Fire House ("BFH").

49.    **Plaintiff Martinsburg Municipal Authority ("Martinsburg")** is a municipal corporation organized pursuant to the Pennsylvania Municipality Authorities Act, 53 Pa C.S.A. §5601, et seq.  Martinsburg operates four groundwater wells to supply drinking water to the community.  Martinsburg has detected PFAS compounds in samples from all four groundwater wells.

50.    **Plaintiff Township of Verona ("Verona")** is located in Northern New Jersey in Essex County and provides drinking water to a population of approximately 15,000 with approximately 4,179 residential and commercial customer connections.

51.    Verona provides drinking water from two wells, both of which have been taken out of service because of PFAS contamination.  Prior to the PFAS contamination, Verona supplied most of its water from its own wells and supplemented its supply with water purchased from the Passaic Valley Water Commission. Since the wells were shut down, however, 100% of Verona's drinking water is purchased from the Passaic Valley Water Commission.

52.    PFAS were first detected in Verona's wells in December 2020. The highest level of PFOA detected was 23.3 ppt and the highest level of PFOS detected was 9.11 ppt.

53.    **Plaintiff Village of Bridgeport ("Bridgeport")** is located in the state of Ohio and has a population of approximately 1,500 residents.  Bridgeport serves 1,150 metered accounts and produces drinking water through groundwater wells. Bridgeport historically utilized five groundwater wells. However, in recent years, findings of a variety of PFAS chemicals in four of its five wells have resulted in the closure of all five wells forcing Bridgeport to purchase all of its drinking water from City of Martin's Ferry.

54.    The Village first became aware of PFAS contamination through testing performed by the State of Ohio in 2020. PFAS findings were revealed in four of those wells (Wells 1-4) with Well 5 yielding no findings. However, Well 5 is too small to rely upon for consistent production of drinking water.

**B.    Party Defendants**

55.    **Defendant Tyco** is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143.

56.    Tyco is the successor-in-interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990.

57.    Beginning in or around 1975, Ansul manufactured and/or distributed and sold AFFF that contained PFOA and PFOS. After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute and sell AFFF that contained PFOA and PFOS.

58.    Upon information and belief, Tyco acquired the Chemguard brand in 2011 and continues to sell Chemguard AFFF products through its Chemguard Specialty Chemicals division.

59.    **Defendant Chemguard, Inc.** is a corporation organized and existing under the laws of Louisiana, with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

60.    The proposed Class Representatives, individually and on behalf of similarly situated Public Water Systems, seek damages against Defendants Tyco and Chemguard as set forth herein relating to their exposure to Defendants' AFFF products containing PFAS.

## GENERAL FACTUAL ALLEGATIONS

### A. PFAS Contamination

61.    PFAS are chemical compounds containing fluorine and carbon. These substances have been used for decades in the manufacture of, among other things, household and commercial products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

62.    PFOA is one of the two most widely studied types of PFAS substances.

63.    PFOA has unique properties that causes it to be: (i) toxic, meaning that it poses serious health risks to humans and animals; (ii) mobile and persistent, meaning that it readily spreads into the environment and does not degrade; and (iii) bioaccumulative and biomagnifying, meaning that it tends to accumulate in organisms, including people, and moves up the food chain.

64.     PFOA easily dissolves in water, and thus it is mobile and easily spreads in the environment. PFOA also readily contaminates soils and leaches from the soil into groundwater, where it can travel significant distances.

65.     PFOA is characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA is thermally, chemically, and biologically stable. It resists degradation due to light, water, and biological processes.

66.     Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

67.     PFOA bioaccumulates/biomagnifies in numerous ways. First, it is relatively stable once ingested, so that it bioaccumulates in individual organisms, including people, for significant periods of time. Because of this stability, any newly ingested PFOA will be added to any PFOA already present. In humans, PFOA remains in the body for years.

68.     PFOA biomagnifies up the food chain. This occurs, for example, when humans eat fish that have ingested PFOA.

69.     The chemical structure of PFOA makes it resistant to breakdown or environmental degradation. As a result, it is persistent when released into the environment.

70.     Exposure to PFAS is toxic and poses serious health risks to humans and animals, including cancer in humans.

71.     PFAS are readily absorbed after consumption or inhalation and accumulate primarily in the bloodstream, kidney, and liver.

72.    AFFF can be made without PFOA and PFOA-precursors.  Despite knowledge of this fact as well as knowledge of the toxic nature of Defendants' AFFF products containing PFAS, Defendants continued to develop, manufacture, formulate, distribute, sell, and/or transport their AFFF products containing PFAS which led to damages to the respective properties of the proposed Class Representatives and proposed Class Members.

73.    At all relevant times, Defendants were sophisticated and knowledgeable in the art and science of developing, manufacturing, formulating, distributing, selling, transporting, storing, loading, mixing, applying, and/or using AFFF products containing PFAS. Defendants understood far more about the properties of PFAS and AFFF products containing PFAS than any of their customers, as well as the proposed Class Representatives and proposed Class Members. Nevertheless, Defendants declined to use their sophistication and knowledge to design safer products and/or warn their customers or the proposed Class Representatives and proposed Class Members of the dangers associated with their AFFF products containing PFAS.

74.    As a direct and proximate result of Defendants' acts and omissions, as alleged in this Class Action Complaint, the respective drinking water supplies of the proposed Class Representatives and proposed Class Members have been contaminated and will continue to be contaminated with PFAS, including PFOA, thereby creating an environmental and public health hazard.

75.    As a direct and proximate result of Defendants' acts and omissions, the proposed Class Representatives and proposed Class Members have incurred, and will continue to incur, investigation, treatment, filtration, monitoring, operation and maintenance costs and other damages.

76.     Defendants had a duty and breached their duty to evaluate and test their AFFF products containing PFAS adequately and thoroughly to determine the environmental fate and transport characteristics and potential human health and environmental impacts before they sold their products. Defendants had, and breached, a duty to minimize the environmental harm caused by their AFFF products containing PFAS. Defendants also failed to warn the proposed Class Representatives and proposed Class Members of the known risks for environmental and health hazards arising from the application, use and/or disposal of their AFFF products containing PFAS when such products were stored, used and/or disposed of as instructed, directed and/or intended.

**B.   The Impact of PFAS on the Drinking Water Supplies of the Proposed Class Representatives and the Proposed Class**

77.     The drinking water supplies of the proposed Class Representatives and the proposed Class have been contaminated with PFAS from Defendants' AFFF products.

78.     Upon information and belief, PFAS from Defendants' AFFF products have traveled via surface water, stormwater, groundwater, etc., and have contaminated the drinking water supplies of the proposed Class Representatives and the proposed Class.

79.     The detection and/or presence of PFAS in the drinking water supplies of the proposed Class Representatives and proposed Class Members has resulted, and will continue to result, in significant injuries and damage to the proposed Class Representatives and the proposed Class.

80.     Upon information and belief, the invasion of the respective properties of the proposed Class Representatives and proposed Class Members with PFAS from Defendants' AFFF products is recurring—new contamination flows regularly and constantly through the groundwater and into the property each day, resulting in new harm to the property of the proposed Class Representatives and proposed Class Members on each occasion.

81.     Because of the risks that PFAS pose to human health, on March 14, 2023, the EPA announced its proposed national maximum contaminant level ("MCL") of 4 parts per trillion for each of PFOA and PFOS in drinking water and health-based maximum contaminant level goals ("MCLGs") of zero for each of PFOA and PFOS in drinking water.

82.     On April 10, 2024, EPA finalized an MCL of 4 ppt for PFOA and 4 ppt for PFOS in public drinking water supplies.

83.     The injuries to the proposed Class Representatives and proposed Class Members caused by Defendants' conduct constitute an unreasonable interference with, and damage to, their respective properties for which they are entitled to any and all damages provided by law.

## CLASS ACTION ALLEGATIONS

84.     Defendants' unlawful conduct, as set forth herein, caused PFAS from Defendants' AFFF products to enter into groundwater and surface water sources, ultimately resulting in the contamination of the drinking water supplies of the proposed Class Representatives and proposed Class Members.

85.     The proposed Class Representatives and proposed Class Members have suffered, and will continue to suffer, property damage as a result of the presence of PFAS from Defendants' AFFF products in their drinking water supplies.

86.     The proposed Class Representatives bring this class action on behalf of themselves and all other similarly situated Public Water Systems.

87.     The proposed Class Members are defined as:

> An Active Public Water System in the United States that has one or more Impacted Water Sources as of May 15, 2024.

88.     The following are specifically excluded as members of the proposed class:

(a) The City of Marinette Waterworks, denoted as Water System ID "WI4380395" in the SDWIS (provided, however, that the City of Marinette Waterworks will be included within the Settlement Class if it so requests);

(b) Non-Transient Non-Community Water Systems serving 3,300 or fewer people;

(c) Transient Non-Community Water Systems of any size;

(d) Any Public Water System that is owned by a State government and lacks independent authority to sue and be sued;

(e) Any Public Water System that is owned by the federal government and lacks independent authority to sue and be sued;

(f) Any privately owned well that provides water only to its owner's (or its owner's tenant's) individual household and any other system for the provision of water for human consumption that is not a Public Water System.

89.    As used in Paragraphs 88 and 89, "Public Water System" means a system for the provision of water to the public for human consumption through pipes or other constructed conveyances, if such system has at least fifteen (15) service connections or regularly serves at least twenty-five (25) individuals.  As used in Paragraphs 88 and 89, a "Public Water System" shall include the owner and/or operator of that system and any public entity that is legally responsible for funding (by statute, regulation, other law, or contract), other than a State or the federal government, a Public Water System described in such Paragraph or has authority to bring a claim on behalf of such a Public Water System.

90.    This action satisfies the ascertainability, numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Federal Rule of Civil Procedure 23.

91.    <u>Ascertainability</u>. The members of the proposed Class are readily ascertainable without extensive and individualized fact-finding and have been identified as putative Class Members by reference to publicly available information.  Each public water provider in the United

States is a permitted entity that is regulated by the EPA. The EPA assigns a unique identification number, called a "PWSID," to each public water provider and maintains a centralized database that contains an inventory of all Public Water Systems in America. This database, called the Safe Drinking Water Information System ("SDWIS"), is regularly updated with classifying information about all Public Water Systems as well as administrative contact information. Thus, all Public Water Systems can be readily ascertained based on their registration and respective, system-specific information in the Federal SDWIS database. Class Notice will be delivered to all eligible Public Water Systems via direct and publication notice. Public Water Systems may also identify themselves as Class Members by submitting a Claims Form and providing additional information, including testing data showing PFAS detections.

92.     Numerosity. The members of the Class are so numerous that their individual joinder is impracticable. Approximately 5,000 Public Water Systems are estimated to fall within the Class definition. The Class Members are geographically located across the United States, making their joinder even more impracticable.

93.     Existence and Predominance of Common Questions of Law and Fact. Common questions of law and fact exist as to all proposed Class Members that predominate over any questions affecting individual Class Members. All proposed Class Members have been subject to the same unlawful conduct of the Defendants and have suffered the same resulting injuries— contamination of their drinking water wells and/or water supplies. Questions of law or fact which are common to the proposed Class Members, as set forth in this Complaint, predominate over questions affecting individual members because the proposed Class Members are similarly situated victims of Defendants' common course of unlawful conduct. Defendants' conduct similarly harmed all proposed Class Members because Defendants developed, manufactured, formulated,

distributed, sold, transported, stored, loaded, mixed, applied and/or used AFFF products

containing PFAS that infiltrated the proposed Class Members' drinking water wells and water

supplies.  In addition, Defendants have no defenses specific to individual Class Members, and their

defenses, if any, apply equally to all proposed Class Members.  The common legal and factual

questions include, but are not limited to, the following:

     a.  When the Defendants designed, manufactured, and sold AFFF products containing PFAS;

     b.  Whether Defendants owed a duty to the proposed Class Members to refrain from the conduct that led to the contamination of their drinking water wells and water supplies with Defendants' AFFF products containing PFAS;

     c.  Whether there is sufficient evidence that Defendants' AFFF products containing PFAS posed/pose a risk of harm to the environment and human health;

     d.  Whether Defendants knew and/or should have known that their AFFF products containing PFAS posed/pose a risk of harm to the environment and human health;

     e.  The extent to which Defendants became aware that their AFFF-containing PFAS posed a risk of harm to the environment and human health;

     f.  Whether Defendants provided adequate warnings about the potential harms associated with Defendants' AFFF products containing PFAS;

     g.  Whether Defendants provided adequate instructions for the use of their AFFF products containing PFAS;

     h.  Whether Defendants provided adequate instructions for the disposal of waste generated by Defendants' AFFF products containing PFAS;

     i.  Whether Defendants made misleading representations or omissions with respect to the environmental and health effects of Defendants' AFFF products containing PFAS;

     j.  Whether Defendants' AFFF products containing PFAS were defectively and/or negligently designed;

     k.  Whether Defendants owed the proposed Class Members duties, including a duty to warn about the propensity of Defendants' AFFF products containing

PFAS to contaminate surface water and groundwater used by Public Water Systems;

l.  Whether Defendants failed to warn about the environmental and health risks posed by Defendants' AFFF products containing PFAS;

m.  Whether Defendants, through their actions and omissions, breached their duties to the proposed Class Members;

n.  Whether Defendants, through their actions and omissions, directly and proximately caused the proposed Class Members' injuries and damages;

o.  Whether Defendants' conduct supports an award of statutory damages; and

p.  Whether the proposed Class Representatives and proposed Class Members are entitled to damages.

94.    The injuries sustained by the proposed Class Representative and proposed Class Members flow, in each instance, from a common nucleus of operative facts—Defendants' misconduct relating to Defendants' AFFF products containing PFAS.

95.    These questions of law and fact that are common to the proposed Class Representatives and proposed Class Members predominate over any questions affecting them individually.

96.    <u>Typicality</u>. The claims of the proposed Class Representatives are typical of the claims of the proposed Class Members in that the proposed Class Representatives, like the proposed Class Members, own and/or operate Public Water Systems that have been and/or are contaminated with PFAS from Defendants' AFFF products, and have incurred costs or will incur costs to test for and/or remove  PFAS from their respective drinking water wells and water supplies.

97.    <u>Adequacy of Representation</u>. The proposed Class Representatives will fairly and adequately protect the interests of the proposed Class Members. The proposed Class Representatives have retained proposed Class Counsel, all of whom are experienced in highly

complex litigation, including litigation involving public entities, widescale environmental damage, class actions and mass torts. Neither the proposed Class Representatives nor proposed Class Counsel have any adverse or antagonistic interests to those of the proposed Class Members, and they will fairly and adequately protect the interests of the proposed Class Members.  Proposed Class Counsel are unaware of any interests adverse or antagonistic to those of the proposed Class Representatives and the proposed Class Members.

98.    <u>Superiority</u>. A class action is superior to any other theoretically available method for the fair and efficient adjudication of this controversy.  Significant economies of time, effort, and expense will inure to the benefit of the Court and the parties in litigation of essentially identical issues on a class-wide rather than a repetitive individual basis.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the judicial system, and the issues raised by this action. The class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.  No unusual difficulties are likely to be encountered in the management of this class action, and concentrating the litigation in this centrally located forum is particularly convenient to the parties.

**FIRST CAUSE OF ACTION**
**PUBLIC NUISANCE**

99.    The proposed Class Representatives reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

100.    Defendants developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used AFFF products containing PFAS in a manner that

created or participated in creating a public nuisance that is harmful to health and obstructs the use of the drinking water supplies of the proposed Class Representatives and proposed Class Members.

101.    The presence of PFAS from Defendants' AFFF products interferes with the use of the drinking water supplies of the proposed Class Representatives and proposed Class Members.

102.    The presence of PFAS from Defendants' AFFF products in the drinking water supplies of the proposed Class Representatives and proposed Class Members caused and/or continues to cause significant costs, inconvenience and annoyance to the proposed Class Representatives and the proposed Class Members, who are all charged with supplying potable drinking water to residents and businesses in various locations throughout the United States.

103.    The presence of PFAS from Defendants' AFFF products in the drinking water supplies of the proposed Class Representatives and proposed Class Members affects a substantial number of people nationwide who rely upon the water wells and water supplies of the proposed Class Representatives and proposed Class Members for commercial and recreational purposes, and it interferes with the rights of the public at large to clean and safe drinking water resources and environment.

104.    An ordinary person would be reasonably annoyed and/or disturbed by the presence in public drinking water of toxic PFAS from Defendants' AFFF products that endanger human health and degrade water quality.

105.    The seriousness of the environmental and human health risk of PFAS from Defendants' AFFF products in the drinking water wells and/or water supplies of the proposed Class Representatives and proposed Class Members far outweighs the social utility, if any, of Defendants' conduct in developing, manufacturing, formulating, distributing, selling, transporting,

storing, loading, mixing, applying and/or using Defendants' AFFF products containing PFAS and concealing the dangers posed to human health and the environment.

106.    The proposed Class Representatives and proposed Class Members have suffered and will continue to suffer this particularized harm which is different from the type of harm suffered by the general public at large, as the proposed Class Representatives and proposed Class Members have incurred and/or will incur substantial costs to remove PFAS from their water supplies.

107.    The proposed Class Representatives and proposed Class Members did not consent to the conduct that resulted in the contamination of their respective drinking water supplies.

108.    Defendants' conduct was a substantial factor in causing the harm to the proposed Class Representatives and proposed Class Members.

109.    Defendants knew or, in the exercise of reasonable care, should have known that the manufacture and sale of AFFF products containing PFAS was causing the type of contamination now found in and around the respective drinking water supplies of the proposed Class Representatives and proposed Class Members.

110.    At all relevant times, Defendants knew or should have known that their AFFF products containing PFAS would contaminate water supplies and were/are associated with serious illnesses and cancers in humans. Defendants, thus, knew or should have known that PFAS contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of public drinking water supplies.

111.    As a direct and proximate result of Defendants' creation of a public nuisance, the proposed Class Representatives and proposed Class Members have suffered, and continue to suffer, monetary damages to be proven at trial.

112.    Defendants' conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, because Defendants developed, manufactured, formulated, distributed, sold, and transported AFFF products containing PFAS knowing that toxic PFAS would be released and would last for centuries.

## SECOND CAUSE OF ACTION
## PRIVATE NUISANCE

113.    The proposed Class Representatives reallege and reaffirm all allegations set forth in the preceding paragraphs.

114.    The respective drinking water supplies of the proposed Class Representatives and proposed Class Members have been contaminated by PFAS as a direct and proximate result of the unreasonable acts and omissions of Defendants as set forth herein.

115.    The PFAS contamination caused by Defendants' unreasonable acts and/or omissions has substantially damaged the respective drinking water supplies of the proposed Class Representatives and proposed Class Members, and interfered with the ordinary safety, use, benefit, and enjoyment of their respective drinking water supplies.

116.    At all relevant times, Defendants knew or should have known that PFAS from their AFFF products would contaminate water supplies and were/are associated with serious illnesses and cancers in humans. Defendants thus knew, or should have known, that PFAS contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of public drinking water supplies.

117.    As a direct and proximate result of Defendants' creation of a private nuisance, the proposed Class Representatives and proposed Class Members have suffered, and continue to suffer, monetary damages to be proven at trial.

118.    Defendants' conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, because Defendants developed, manufactured, formulated, distributed, sold, and transported AFFF products containing PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

**THIRD CAUSE OF ACTION**
**STRICT LIABILITY- DESIGN DEFECT**
**CONSUMER EXPECTATION TEST**

119.    The proposed Class Representatives reallege and reaffirm all allegations set forth in the preceding paragraphs.

120.    The proposed Class Representatives and proposed Class Members were harmed by Defendants' AFFF products containing PFAS which were developed, manufactured, formulated, distributed, sold and transported by Defendants, and which were dangerous to an extent beyond that contemplated by the ordinary consumer, defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

121.    The design of Defendants' AFFF products containing PFAS were defective because the products did not perform as safely as an ordinary consumer would have expected them to perform.

122.    Defendants' AFFF products containing PFAS did not perform as safely as an ordinary consumer would have expected them to perform when applied, used and/or disposed of as directed, instructed and/or intended and/or when misused in a reasonably foreseeable way.

123.    The drinking water supplies of the proposed Class Representatives and proposed Class Members were, are and will continue to be harmed by Defendants' AFFF products containing PFAS.

124.    The failure of Defendants' AFFF products containing PFAS to perform safely was a substantial factor in causing harm to the drinking water supplies of the proposed Class Representatives and proposed Class Members.

125.    Defendants had actual knowledge that their AFFF products containing PFAS were causing the type of harm suffered by the proposed Class Representatives and proposed Class Members.

126.    Defendants knew or should have known that their AFFF products containing PFAS caused harm even when used as intended, instructed, and normally expected and that no third-party could prevent such harm.

127.    Defendants' conduct lacked care and was a departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and, thus, Defendants were negligent.

128.    Defendants developed, manufactured, formulated, distributed, sold and transported their AFFF products containing PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

**FOURTH CAUSE OF ACTION**
**STRICT LIABILITY - DESIGN DEFECT**
**RISK-BENEFIT TEST**

129.    The proposed Class Representatives reallege and reaffirm all allegations set forth in the preceding paragraphs.

130.    The proposed Class Representatives and proposed Class Members were, are and will continue to be harmed by Defendants' AFFF products containing PFAS which were developed, manufactured, formulated, distributed, sold and transported by Defendants, and which were defectively designed in that their safety risks outweighed their benefits, if any.

131.    The design of Defendants' AFFF products containing PFAS was a substantial factor in causing harm to the proposed Class Representatives and proposed Class Members.

132.    The gravity of the huge environmental harm resulting from the use of Defendants' AFFF products containing PFAS was, is, and will be enormous because PFAS contamination is widespread, persistent, and toxic.

133.    The likelihood of this harm was, is, and will continue to be very high because Defendants' AFFF products containing PFAS were toxic, cannot be contained, and do not readily degrade in the environment.

134.    Defendants knew and/or should have known that their AFFF products containing PFAS were toxic, could not be contained, and do not readily degrade in the environment.

135.    At the time of manufacture, there were alternative safer designs that were feasible, cost effective, and advantageous to Defendants.  For example, Defendants could have developed, manufactured, formulated, distributed, sold and transported AFFF products not containing fluorine.

136.    Defendants' conduct lacked care and was a departure from what reasonably careful companies would do in the same situation to prevent harm to others and the environment, and thus Defendants were negligent.

137.    Defendants developed, manufactured, formulated, distributed, sold and transported AFFF products containing PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries, and that these dangers significantly outweighed any benefits of Defendants' AFFF products containing PFAS.

## FIFTH CAUSE OF ACTION
## NEGLIGENCE - DESIGN DEFECT

138.    The proposed Class Representatives reallege and reaffirm all allegations set forth in the preceding paragraphs.

139.    The proposed Class Representatives and proposed Class Members were, are and will continue to be harmed by Defendants' AFFF products containing PFAS which were developed, manufactured, formulated, distributed, sold and transported by Defendants, and which were defectively designed in that they were dangerous to an extent beyond that contemplated by the ordinary consumer, and their safety risks outweighed their benefits, if any, and they did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

140.    At all relevant times, Defendants had a duty not to place a defective product into the stream of commerce, meaning that Defendants had a duty not to place into the stream of commerce any product that was unreasonably dangerous.

141.    Defendants breached that duty by developing, manufacturing, formulating, distributing, selling and transporting their AFFF products containing PFAS which, at all relevant times, were unreasonably dangerous.

142.    Defendants' AFFF products containing PFAS, that were used in the vicinity of the drinking water supplies of the proposed Class Representatives and/or proposed Class Members, were defective in design and unreasonably dangerous because, among other things:

    a.    Defendants' AFFF products containing PFAS caused and/or would continue to cause extensive and persistent contamination of groundwater when used in its foreseeable and intended manner;

    b.    Contamination with Defendants' AFFF products containing PFAS in drinking water poses significant risks to public health and welfare; and

      c. Defendants failed to conduct and/or disclose adequate scientific studies to evaluate the impact of PFAS contamination from Defendants' AFFF products on the environment and human health.

143. At all relevant times, Defendants' AFFF products containing PFAS were dangerous to an extent beyond that contemplated by the ordinary consumer and posed a foreseeable risk of harm that outweighed the cost to Defendants of measures designed to mitigate that risk.

144. Defendants knew, or should have known, that third parties would purchase Defendants' AFFF products containing PFAS and use them without knowledge of their defects and hazardous consequences.

145. Defendants knew or should have known that at the time of manufacture, that PFAS was not biodegradable and bioaccumulated in fish, wildlife, and humans.

146. Defendants' AFFF products containing PFAS were purchased by third parties who used them in a reasonably foreseeable manner and without substantial change in their condition.

147. Defendants knew or should have known that the use of their AFFF products containing PFAS by these third parties would result in the spillage, discharge, disposal, or release of PFAS onto land or into groundwater supplies.

148. Defendants knew or should have known about safer, feasible alternatives to their AFFF products containing PFAS, and the omission of those alternative designs rendered Defendants' AFFF products containing PFAS defective.

149. As a direct and proximate result of Defendants' negligence, the proposed Class Representatives and proposed Class Members were, are and will continue to be harmed by the contamination of their respective drinking water supplies with PFAS from Defendants' AFFF products.

150.    Upon information and belief, Defendants knew and/or should have known that PFAS in their AFFF products would result in injury to the proposed Class Representatives and proposed Class Members.

151.    Defendants' conduct lacked care and was a departure from what a reasonably careful companies would do in the same situation to prevent harm to others and the environment, and, thus, Defendants were negligent.

152.    Defendants developed, manufactured, formulated, distributed, sold and transported their AFFF products containing PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

**SIXTH CAUSE OF ACTION**
**STRICT LIABILITY- FAILURE TO WARN**

153.    The proposed Class Representatives reallege and reaffirm all allegations set forth in in the preceding paragraphs.

154.    The proposed Class Representatives and proposed Class Members were, are and will continue to be harmed by Defendants' AFFF products containing PFAS which were developed, manufactured, formulated, distributed, sold and transported by Defendants, and which were designed, manufactured, sold, and distributed without adequate warning of toxicity, potential human health risks, and environmental hazards.

155.    Defendants' AFFF products containing PFAS were designed, manufactured, sold, and distributed without instructions to prevent contamination of soil and water and the resulting potential human health risks and environmental hazards.

156.    The potential environmental hazard and toxicity risks of Defendants' AFFF products containing PFAS were known and/or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community and/or in light of Defendants'

superior knowledge about PFAS at the time of the development, manufacture, formulation, distribution, sale and transportation of their AFFF products containing PFAS.

157.    The potential environmental hazard and toxicity risks presented a substantial danger when Defendants' AFFF products containing PFAS were used and/or disposed of as directed, instructed and/or intended and/or when misused in a reasonably foreseeable way. Ordinary consumers and third parties would not have recognized the potential risks.

158.    Defendants had strict duties not to develop, manufacture, formulate, distribute, sell and transport their AFFF products containing PFAS without adequate warnings of the potential risks associated with Defendants' products, which Defendants knew or should have known resulted from the foreseeable use, storage and/or disposal of Defendants' AFFF products containing PFAS.

159.    Defendants breached these duties by failing to adequately warn or instruct of the potential risks associated with the application, use and disposal of Defendants' AFFF products containing PFAS and the dangers to drinking water supplies that were contaminated with PFAS.

160.    The lack of sufficient instructions or warnings was a direct, proximate and/or substantial factor in causing harm to the drinking water supplies of the proposed Class Representatives and proposed Class Members.

161.    Defendants' conduct lacked care and was a departure from what reasonably careful companies would do in the same situation to prevent harm to others and the environment, and, thus, Defendants were negligent.

162.    Defendants developed, manufactured, formulated, distributed, sold and transported their AFFF products containing PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries, without warning and/or instruction of these dangers.

## SEVENTH CAUSE OF ACTION
## NEGLIGENCE - FAILURE TO WARN

163.    The proposed Class Representatives reallege and reaffirm all allegations set forth in the preceding paragraphs.

164.    The proposed Class Representatives and proposed Class Members were, are and will continue to be harmed by Defendants' AFFF products containing PFAS which were developed, manufactured, formulated, distributed, sold and transported by Defendants, and which were designed, manufactured, sold, and distributed without adequate warning of toxicity, potential human health risks, and environmental hazards.

165.    Defendants' AFFF products containing PFAS were designed, manufactured, sold, and distributed without instructions to prevent contamination of soil and water and the resulting potential human health risks and environmental hazards.

166.    The potential environmental hazard and toxicity risks of Defendants' AFFF products containing PFAS were known and/or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community and/or in light of Defendants' superior knowledge about Defendants' AFFF and PFAS at the time of their development, manufacture, formulation, distribution, sale, transportation and/or use of their AFFF products containing PFAS.

167.    Defendants had a duty to the proposed Class Representatives and proposed Class Members to warn about the potential environmental hazard and toxicity risks associated with Defendants' AFFF products containing PFAS.

168.    Defendants breached this duty by failing to adequately warn or instruct of the potential risks associated with Defendants' AFFF products containing PFAS.

169.    Defendants had a duty to the proposed Class Representatives and proposed Class Members to provide sufficient instructions or warnings relating to Defendants' AFFF products containing PFAS so as to avoid contamination of drinking water wells and water supplies throughout the United States.

170.    Defendants breached this duty by failing to provide sufficient instructions or warnings relating to Defendants' AFFF products containing PFAS so as to avoid contamination of drinking water supplies throughout the United States.

171.    Defendants' breaches were a substantial factor in causing harm to the drinking water supplies of the proposed Class Representatives and proposed Class Members.

172.    Defendants knew or reasonably should have known that users and third parties would not realize the dangers associated with Defendants' AFFF products containing PFAS.

173.    Defendants' conduct lacked care and was a departure from what reasonably careful companies would do in the same situation to prevent harm to others and the environment, and, thus, Defendants were negligent.

174.    Defendants developed, manufactured, formulated, distributed, sold and transported AFFF products containing PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries, without warning and/or instruction of these dangers.

### EIGHTH CAUSE OF ACTION
### NEGLIGENCE - FAILURE TO RECALL

175.    The proposed Class Representatives reallege and reaffirm all allegations set forth in the preceding paragraphs.

176.    Defendants' AFFF products containing PFAS were developed, manufactured, formulated, distributed, sold and transported by Defendants, without adequate warning of toxicity, potential human health risks, and environmental hazards.

177.    Defendants had a duty to use reasonable care to warn or instruct about the risks associated with Defendants' AFFF products containing PFAS.

178.    Defendants breached the duty to use reasonable care by failing to warn or instruct about the risks associated with Defendants' AFFF products containing PFAS.

179.    Defendants had a duty to recall Defendants' AFFF products containing PFAS when they knew or should have known about the risks associated with Defendants' AFFF products containing PFAS.

180.    Defendants breached the duty to recall by failing to recall their AFFF products containing PFAS when Defendants first learned or should have learned about the risks associated with their AFFF products containing PFAS.

181.    Defendants knew or reasonably should have known that Defendants' AFFF products containing PFAS were dangerous or likely to be dangerous when applied, used and/or disposed of as directed, instructed and/or intended and/or when misused in a reasonably foreseeable way.

182.    At all relevant times, Defendants knew or reasonably should have known that users and third parties would not realize the danger associated with Defendants' AFFF products containing PFAS.

183.    At all relevant times, Defendants knew or reasonably should have known of the human health risks and environmental dangers presented by Defendants' AFFF products containing PFAS.

184.    A reasonable developer, manufacturer, formulator, distributor, seller, transporter and/or user of products under the same or similar circumstances would have recalled Defendants' AFFF products containing PFAS.

185.    The proposed Class Representatives and proposed Class Members were harmed by Defendants' AFFF products containing PFAS, which have contaminated their drinking water wells and/or water supplies.

186.    Defendants' failure to warn and/or recall Defendants' AFFF products containing PFAS was a substantial factor in causing the harm suffered by the proposed Class Representatives and proposed Class Members.

187.    Defendants' conduct lacked care and was a extreme departure from what reasonably careful companies would do in the same situation to prevent harm to others and the environment, and, thus, Defendants were negligent.

188.    Defendants developed, manufactured, formulated, distributed, sold, transported and/or used Defendants' AFFF products containing PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries, without warning and/or instruction of these dangers.

### NINTH CAUSE OF ACTION
### TRESPASS

189.    The proposed Class Representatives reallege and reaffirm all allegations set forth in the preceding paragraphs.

190.    The proposed Class Representatives and proposed Class Members own and/or operate drinking water systems that draw their water from various sources, including groundwater and surface water.

191.    The proposed Class Representatives and proposed Class Members have significant property interests in the waters they appropriate and use, and they also have significant property interests in the groundwaters that supply their drinking water wells.

192.    Defendants intentionally, recklessly, and/or negligently caused PFAS from their AFFF products to enter into the groundwaters, aquifers, and drinking water supplies owned and/or operated by the proposed Class Representatives and proposed Class Members.

193.    The proposed Class Representatives and proposed Class Members did not give permission for the entry of PFAS from Defendants' AFFF products on to their respective properties.

194.    The proposed Class Representatives and proposed Class Members were, are and will continue to be harmed by PFAS from Defendants' AFFF products which have contaminated their drinking water wells and/or water supplies.

195.    Defendants' unlawful conduct was a substantial factor in causing the harm that the proposed Class Representatives and proposed Class Members have suffered and/or continue to suffer.

196.    Defendants' conduct relating to their AFFF products containing PFAS lacked any reasonable care and was an extreme departure from what reasonably careful companies would do in the same situation to prevent harm to others and the environment, and, thus, Defendants were grossly negligent.

197.    Defendants' conduct in trespassing on the property of the proposed Class Representatives and proposed Class Members was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, because Defendants developed, manufactured, formulated, distributed, sold, and/or used their AFFF products containing PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

## PRAYER FOR RELIEF

WHEREFORE, the proposed Class Representatives, on behalf of themselves and the proposed Class Members, request that the Court enter an Order or judgment against Defendants, jointly and severally, as follows:

1.      Certification of the action as a Class Action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, and appointment of the proposed Class Representatives as Class Representatives and the proposed Counsel as Class Counsel;

2.      Compensatory and/or consequential damages according to proof including, but not limited to:

      a.      costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent of PFAS contamination from Defendants' AFFF products on and within the drinking water wells and water supplies of the proposed Class Representatives and the proposed Class Members,

      b.      costs and expenses related to the past, present, and future treatment and remediation of PFAS contamination from Defendants' AFFF products of the drinking water wells and water supplies of the proposed Class Representatives and the proposed Class Members, or, in the alternative, the costs and expenses associated with and related to the removal and disposal of such contamination; and

      c.      costs and expenses related to the past, present, and future installation and maintenance of monitoring mechanisms to assess and evaluate PFAS on and within the drinking water wells and water supplies of the proposed Class Representatives and the proposed Class Members; and

3.      Statutory damages;

4.      Costs, disbursements and attorneys' fees of this lawsuit;

5.      Pre-judgment and post-judgment interest on the monetary relief; and

6.      Any other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

The proposed Class Representatives demand a trial by jury.

Dated: April 22, 2024

Respectfully Submitted,

/s/ Michael A. London
Michael A. London
Douglas and London PC
59 Maiden Lane, 6th Floor
New York, NY 10038
212-566-7500
212-566-7501 (fax)
mlondon@douglasandlondon.com

/s/ Paul J. Napoli
Paul J. Napoli
Napoli Shkolnik
1302 Avenida Ponce de León
San Juan, PR 00907
Tel: (833) 271-4502
Fax: (646) 843-7603
pnapoli@nsprlaw.com

/s/ Scott Summy
Scott Summy
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
214-521-3605
ssummy@baronbudd.com

/s/ Joseph Rice
Joseph Rice
Motley Rice LLC
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
P: (843) 216-9000
Fax: 843-216-9440
jrice@motleyrice.com

*Proposed Class Counsel*