**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION ) ) | Master Docket No.: 2:18-mn-2873-RMG |

| | |
|---|---|
| CITY OF CAMDEN, *et al.*,<br><br>        *Plaintiffs*,<br><br>-*vs*-<br><br>TYCO FIRE PRODUCTS LP, individually and as successor in interest to The Ansul Company, and CHEMGAURD, INC.,<br><br>        *Defendants*. | Civil Action No.: 2:24-cv-02321-RMG |

**ORDER AND OPINION**

Before the Court is Class Counsel's motion for final approval of class settlement and final certification of the settlement class (Dkt. No. 6165). On June 11, 2024, the Court preliminarily approved the Settlement Agreement reached between Plaintiffs and Defendants Tyco Fire Products LP and Chemgaurd, Inc. (collectively, "Tyco" or "Defendants") (Dkt. No. 5147). The Court conducted a Fairness Hearing on November 1, 2024 regarding the proposed Settlement Agreement. For the reasons set forth below, the Court grants Class Counsel's motion for final approval.

**Factual Background[1]**

On December 7, 2018, the Judicial Panel on Multidistrict Litigation (the "JPML") centralized in this Court approximately 90 civil actions from eight judicial districts involving claims that aqueous film-forming foams ("AFFF") had contaminated local ground water and

---

[1] Unless otherwise noted, capitalized terms have the same meaning as in the Settlement Agreement and all citations are to the docket in 2:18-mn-2873-RMG.

drinking water supplies in numerous communities across the United States. In its transfer order, the JPML noted:

> These actions thus share factual questions concerning *the toxicity of PFOA and PFOS and their effects on human health; the chemical properties of these substances and their propensity to migrate in groundwater supplies; the knowledge of the AFFF manufacturers regarding the dangers of PFOA and PFOS; their warnings, if any, regarding proper use and storage of AFFFs; and to what extent, if any, defendants conspired or cooperated to conceal the dangers of PFOA and PFOS in their products*.

*In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 357 F. Supp. 3d 1391, 1394 (JPML 2018).

Following the creation of this multidistrict litigation ("MDL"), and pursuant to Case Management Orders 2 and 3, the Court appointed Plaintiffs' Co-Lead Counsel, the initial slate of Plaintiffs' Executive Committee ("PEC") members, and Advisory Counsel to the PEC. (Dkt. No. 6165-1 at 14). Over the course of this MDL, Plaintiffs in this MDL, led by Plaintiffs' Co-Lead Counsel and the PEC, conducted approximately "481,000 hours of work . . . includ[ing], *inter alia*, MDL oversight and administration, bellwether efforts, general liability efforts, significant legal briefing efforts including successfully overcoming the government contractor defense, service of nine (9) general expert reports and twelve (12) case-specific expert reports, and one (1) expert report with a general sub-part and three (3) case-specific sub-parts, as well as multiple supplemental reports." (*Id.* at 15).

Plaintiffs in the MDL also prepared *City of Stuart, Fla. v. 3M Company, et al.*, Case No. 2:18-cv-3487-RMG, for trial, which the Court stayed on June 5, 2023 due to the resolution reached in both the 3M and DuPont Public Water System ("PWS") Settlements. (*Id.*). Tyco was voluntarily dismissed from *Stuart*, but the dismissal occurred only a month before trial, meaning Plaintiffs were prepared to present Tyco's liability to a jury. (*Id.*)

After the 3M and DuPont PWS Settlements, the Court initiated the Telomer AFFF Bellwether Program, specifically targeting the telomer defendants which includes Tyco. (*Id.*) Through the bellwether process, Plaintiffs reviewed thousands of pages of documents specific to

each telomer bellwether plaintiff, hours of witness preparation, over two dozen case-specific depositions, site visits in anticipation of expert reports, and hundreds of hours of expert report preparation. (*Id.*) The Settlement Agreement currently before the Court was ultimately reached in the midst of the Telomer AFFF Bellwether Program. (*Id.* at 15-16).

On April 12, 2024, with the assistance and oversight of Court-appointed mediator Judge Layn Phillips (Ret.), the Parties executed the Settlement Agreement. (*Id.* at 17-18). As the Parties note, however, settlement discussions had begun between Tyco and the MDL Plaintiffs a year and a half before April 2024. (*Id.*).

On April 22, 2024, on behalf of themselves and all other similarly situated PWS, Plaintiffs filed a class action complaint against Defendants claiming one or more of the following types of damages: (1) the costs of testing and monitoring of the ongoing contamination of their Drinking Water wells and supplies; (2) the costs of designing, constructing, installing and maintaining a filtration system to remove or reduce levels of PFAS detected in Drinking Water; (3) the costs of operating that filtration system; and (4) the costs of complying with any applicable regulations requiring additional measures. (*City of Camden, et al. v. Tyco*, C.A. No. 2:24-cv-2873-RMG, Dkt. No. 1). The Parties intended that the complaint be used as the mechanism for a class-wide settlement and the complaint identifies each Class Representative, defines the Settlement Class, and states the claims intended to become Released Claims and concluded by the Final Judgment. (Dkt. No. 6165 at 18).

On June 11, 2024, the Court granted preliminary approval of the Parties' proposed settlement. (Dkt. No. 5110) (the "PAO"). The PAO established that the objection period would end on August 24, 2024, and that the last day of the opt-out period would be September 23, 2024. Class Counsel were directed to file its motion for attorneys' fees by July 22, 2024. The deadline for the instant Final Approval Motion and responses to any objections was also set forth in the

PAO. The Final Fairness Hearing was set for November 1, 2024.

On October 30, 2024, Special Master Matt Garretson filed a declaration stating that there were two objections filed on behalf of five PWS. (Dkt. No. 6329). The declaration further stated that 606 PWS submitted requests for exclusion. Of those 606 PWS, 258 PWS submitted timely and properly filed requests for exclusions and were on the Class Notice list, 298 PWS submitted timely and properly filed requests for exclusions but were not on the Class Notice list, and 50 PWS submitted requests for exclusions but either did not meet one of the requirements of the Settlement Agreement or Preliminary Approval Order or whose eligibility as claimants is not ascertainable. (*Id.*, ¶ 6).

On November 1, 2024 the Court conducted a Fairness Hearing.

### Summary of Settlement Agreement

As provided for in the Settlement Agreement, Defendants have agreed to pay or cause to be paid a Settlement Amount of seven hundred and fifty million dollars ($750,000,000.00) in exchange for receiving releases, covenants not to sue, and dismissals from Settlement Class Members. (Dkt. No. 6165-1 at 21).

The preliminarily approved Settlement Class consists of "every Active Public Water System in the United States of America that has one or more Impacted Water Sources as of the Settlement Date (May 15, 2024)." (*Id.*)

The following are excluded from the Settlement Class:

> (a) the City of Marinette Waterworks, denoted as Water System ID "W14380395" in the SDWIS; provided, however, that the City of Marinette Waterworks will be included within the Settlement Class if it so requests.
>
> (b) Any Public Water System that is owned by a State government and lacks independent authority to sue and be sued.
>
> (c) Any Public Water System that is owned by the federal government and lacks independent authority to sue and be sued

(d) Any privately owned well that provides water only to its owner's (or its owner's tenant's) individual household and any other system for the provision of water for human consumption that is not a Public Water System

(*Id.*)

The Settlement Amount is broken down into three separate payment sources: the Action Fund, the Supplemental Fund, and the Special Needs Fund. (*Id.*)

The Action Fund will compensate all Qualifying Settlement Class Members with Impacted Water Sources that have timely submitted a Claims Form and performed the requisite testing for each of its Impacted Water Sources. (*Id.* at 22). The Claims Administrator will process the test results and relevant information provided on the Claims Form using the mathematical formula set forth in the Allocation Procedures to score each Impacted Water Source owned and/or operated by a Qualifying Settlement Class Member. (*Id.*) The Claims Administrator will use the computed Base Scores to provide the Allocated Amount for each Impacted Water Source. (*Id.* at 22-24). Because the Allocation Procedures require the information solicited in the Claims Forms to calculate Base Score and all Base Scores are required to calculate individual Allocated Amounts, each Qualifying Settlement Class Member's Allocated Amount will not be determinable until all applicable Claims Forms are submitted and processed by the Claims Administrator. (*Id.* at 24). The Claims Form submission deadline for the Action Fund is 60 days after the Effective Date. (*Id.*)

The Supplemental Funds compensate Qualifying Settlement Class Members that "have an Impacted Water Source that did not exceed the federal or an applicable state Maximum Contaminant Level ("MCL") at the time they submitted their Claims Forms, but because of subsequent testing, obtain a Qualifying Test Results that either (i) exceeds the federal PFAS MCLs or an applicable state MCL; or (ii) exceeds a future state or federal PFAS MCL." (*Id.* at 25). The Supplemental Fund also compensates a Qualifying Settlement Class Member with a Water Source that initially did not have a Qualifying Test Result showing a Measurable Concentration of PFAS and later had such a

Qualifying Test Result. (*Id.*)

For each Impacted Water Source, the Claims Administrator will approximate the Allocated Amount that each Impacted Water Source would have been allocated had it been in the Action Fund and shall issue funds from the Supplemental Fund in the amounts that reflect the difference between the amount the Impacted Water Source would have been allocated had it been in the Action Fund with an MCL exceedance and what the Qualifying Settlement Class Member as already received, if anything. (*Id.*) The deadline for Claims Form submission for the Supplemental Fund is December 31, 2030. (*Id.*)

The Special Needs Funds will compensate Qualifying Settlement Class Members who have already spent money to address PFAS detections in their Impacted Water Sources, such as by taking wells offline, reducing flow rates, drilling new wells, pulling water from other sources and/or purchasing supplemental water. (*Id.* at 25-26).

A Special Needs Fund Claims Form must be submitted no later than 45 days after the deadline for submission of the PWS Claims Form. Once all Phase One Special Needs Fund Claims Forms are timely received, the Claims Administrator will review them and determine which Qualifying Settlement Class Members shall receive additional compensation and the amount of compensation. The Claims Administrator will recommend the awards to the Special Master who must review and ultimately approve or reject them. (*Id.*)

## Analysis

### I.    Class Action Fairness Act of 2005

The Class Action Fairness Act, 28 U.S.C § 1711 *et seq.* ("CAFA"), requires settling defendants to serve notice of a proposed settlement on the "appropriate" state and federal officials after a proposed class action settlement is filed with the court. 28 U.S.C. § 1715(b). The Court finds Defendants has satisfied CAFA's notice requirement. (Dkt. No. 6165-2 at 2).

## II.     Settlement Class Certification

Under Federal Rule of Civil Procedure 23, to certify a class action, the class must meet the four Rule 23(a) prerequisites and fit within one of the three Rule 23(b) categories. *See Boyd v. Coventry Health Care Inc.,* 299 F.R.D. 451, 457–58, (D. Md. 2014). Class Counsel seeks certification under Rule 23(b)(3). (Dkt. No. 4273-1 at 45).

When parties seek certification for settlement under Rule 23(b)(3), although the "district court need not inquire whether the case, if tried, would present intractable management problems" under Rule 23(b)(3)(D), the other Rule 23 requirements "demand undiluted, even heightened, attention." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 620 (1997).

### a.    Ascertainability

Although not self-evident on the face of Fed. R. Civ. P. 23, it is inherent in the concept of class certification that there must be a "readily identifiable" set of putative class members. *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014). This is referred to as "ascertainability." *Id.* Plaintiffs need not be able to identify each and every class member at the time of class certification, but class members must be identifiable by reference to objective criteria without "extensive and individualized fact-finding or 'mini-trials[.]'" *Id.* (citation omitted).

Here, the proposed Settlement Classes meet this requirement because the putative Settlement Class Members are objectively described, and many are readily identifiable by reference to publicly available information and, if necessary, confirmatory testing.

### b.    Numerosity

Numerosity exists when the proposed class "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no set minimum number or "mechanical test for numerosity." *Holsey v. Armour & Co.*, 743 F.2d 199, 217 (4th Cir. 1984) (citing *Kelley v. Norfolk & Western Ry. Co.*, 584 F.2d 34 (4th Cir. 1978)).

The numerosity requirement is easily met by the putative Settlement Class, which is projected to include over 12,000 PWS. (Dkt. No. 4273-1 at 46). *See, e.g.*, *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 425 (4th Cir.2003) (noting with approval the district court's observation that "1400 employees plus their families" "easily" satisfied Rule 23(a)(1)'s numerosity requirement).

### c. Commonality

Commonality exists when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality requires that a proposed class action have "the capacity . . . to generate answers" that "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart Stores v. Dukes*, 564 U.S. 338, 350 (2011). Minor factual variances will not necessarily preclude commonality, so long as the claims arise from the same general set of facts and "the class members share the same legal theory." *Mitchell–Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 557 (D. Md. 2006); *see also Jeffreys v. Commc'ns Workers of Am., AFL–CIO*, 212 F.R.D. 320, 322 (E.D. Va. 2003). Plaintiffs certifying a class under Rule 23(b) carry a related, but more demanding, burden of proving that these common questions of law or fact not only exist, but also "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Because the predominance inquiry is "more stringent," that analysis may "subsume[ ] . . . or supersede[ ]" the Rule 23(a)(2) commonality analysis. *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 n.4 (4th Cir. 2001) (quoting *Amchem Prods., Inc.*, 521 U.S. at 609).

The Court finds that the putative Settlement Class meets this requirement. Plaintiffs' claims arise from similar, if not identical, allegations that Defendants knew of the environmental and potential human health risks associated with exposure to PFAS, yet continued to develop, manufacture, distribute, and sell PFAS and products containing PFAS. (Dkt. No. 6165-1 at 43). Likewise, Plaintiffs and the preliminarily approved Settlement Class Members have all alleged

that Defendants failed to warn users, bystanders, or public agencies of the risks associated with their products that contained PFAS. (*Id.*) Plaintiffs and the Settlement Class Members' claims arise out of a common core of salient facts relevant to Defendants which, for reasons stated *infra*, predominate over questions concerning only individual members such as damages.

### d. Typicality

The typicality prerequisite requires that the class representative "be part of the class and possess the same interest and suffer the same injury as the class members." *Lienhart*, 255 F.3d at 146 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 (1982)). "Nevertheless, the class representatives and the class members need not have identical factual and legal claims in all respects." *Fisher v. Va. Elec. and Power Co.*, 217 F.R.D. 201, 212 (E.D. Va. 2003). The key inquiry is whether the "class representatives assert claims that fairly encompass those of the entire class, even if not identical." *Id.* To satisfy typicality, the plaintiff seeking to certify the class must show: "(1) that their interests are squarely aligned with the interests of the class members; and (2) that their claims arise from the same events and are premised on the same legal theories as the claims of the class members." *Jeffreys*, 212 F.R.D. at 322.

The Court finds that Plaintiffs' claims are typical of those of the putative Settlement Class Members. Plaintiffs, like the Settlement Class Members, are PWS that have asserted claims for actual or threatened injuries caused by PFAS contamination. (Dkt. No. 6165-1 at 43-44). In addition, Plaintiffs and the Settlement Class Members rely on the same common core of facts to allege that Defendants knowingly sold defective PFAS and failed to warn of those defects, leading to the actual or threatened contamination of their respective Water Sources. (*Id.*). Plaintiffs and the Settlement Class Members also assert a common damages theory that seeks recovery of the costs incurred in testing, monitoring, remediating and/or treating their Water Sources, either to monitor for PFAS contamination or to remediate existing PFAS contamination from their Drinking Water.

(*Id.*)

### e. Adequacy of Representation

Lastly, the adequacy requirement is met when: (1) the named plaintiff does not have interests antagonistic to those of the class; and (2) plaintiff's attorneys are "qualified, experienced, and generally able to conduct the litigation." *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 238 (S.D.W. Va. 2005). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc.*, 521 U.S. at 625.

Plaintiffs meet this requirement. The Court finds that the Class Representatives have no interests antagonistic to those of the class, (Dkt. No. 6165-1 at 45-46) and Class Counsel are easily qualified, experienced, and able to conduct this litigation. Further, Plaintiffs and Class Counsel have demonstrated a willingness and ability to prosecute the class claims and have extensive experience in class actions.

### III.    Rule 23(b)(3)

In addition to meeting the threshold requirements of Rule 23(a), a plaintiff seeking class certification must prove the case qualifies as one of the three Rule 23(b) class types. Here, Plaintiffs seek to qualify as a Rule 23(b)(3) class, which requires proof that: (1) common questions of law or fact predominate, and (2) a class action is the superior method of adjudication. Rule 23(b)(3).

The Court finds that common questions of law or fact predominate because Plaintiffs and Settlement Class Members are PWS that claim to have been injured by a common course of conduct that resulted in substantially similar damages to Plaintiffs and the putative Class Members. (Dkt. No. 6165-1 at 47). While claimants' damages may differ, these differences pale in comparison to the otherwise common questions of law and fact that concern Defendants.

The Court further finds a class action to be the superior method of settling this case. (Dkt. No. 6165-1 at 46-48). The alternative to the efficiency achieved through the proposed settlement

would be for federal judges in 94 judicial districts to adjudicate—over 12,000 times—claims directly tied to Defendants' alleged common course of conduct. *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2021 U.S. Dist. LEXIS 16470, *6 (D.S.C. Jan. 25, 2021) ("*Campbell*") ("The court must compare the possible alternatives to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court. Where . . . common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain."). Other factors strongly favor class wide resolution of this matter, including the expense, burden, risk, and length of trial and appellate proceedings were Settlement Class Members to pursue individual litigation. *Stillmock*, 385 F. App'x at 275; *Campbell*, U.S. Dist. LEXIS 16470, at *13 ("Similarly, there is a sufficient desirability to concentrate the litigation in the forum given its familiarity with the relevant issues as the transferee Court.").

## IV.    Settlement Agreement

Federal Rule of Civil Procedure 23(e) provides that "[t]he claims, issues, or defenses of a certified class . . . may be settled, voluntarily dismissed, or compromised only with the court's approval" and Rule 23(e)(2) requires that the Court find that a proposed settlement is "fair, reasonable, and adequate." Under Rule 23(e)(2), as amended in 2018, the Court considers whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;
(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
(iii) the terms of any proposed award of attorney's fees, including timing of payment; and
(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Rule 23(e)(2). The primary concern addressed by this requirement is the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations. *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991).

The Fourth Circuit "has developed multifactor standards for assessing whether a class-action settlement is 'fair, reasonable, and adequate' under Rule 23(e)(2)." *In re: Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 952 F.3d 471, 484 (4th Cir. 2020).[2] The Fourth Circuit has specified the following factors for assessing fairness: (1) the posture of the case at the time settlement was proposed; (2) the extent of discovery that had been conducted; (3) the circumstances surrounding the negotiations; and (4) the experience of counsel in the area of the class action litigation. *Id.* While the Fourth Circuit has "not enumerated factors assessing a settlement's reasonableness," it has specified factors for assessing its adequacy, including: (1) the relative strength of the plaintiffs' case on the merits; (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; (3) the anticipated duration and expense of additional litigation; (4) the solvency of the defendant and the likelihood of recovery on a litigated judgment; and (5) the degree of opposition to the settlement. *Id.*

The Court first articulates its reasoning for finding that the Settlement Agreement satisfies

---

[2] The Fourth Circuit's "factors for assessing class-action settlements almost completely overlap with the new Rule 23(e)(2) factors." *In re: Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 952 F.3d 471, 484 & n.8 (4th Cir. 2020)*; see also Herrera v. Charlotte Sch. of L., LLC*, 818 F. App'x 165, 176 n.4 (4th Cir. 2020) ("Federal Rule of Civil Procedure 23(e)(2) has been amended and now sets forth factors for the district court to assess in evaluating fairness, reasonableness, and adequacy. Recognizing that, this Court continues to apply its own standards as they almost completely overlap with the new Rule 23(e)(2) factors, rendering the analysis the same.").

Rule 23(e)(2) and *Jiffy Lube* before addressing objections on these points.

### a. Fairness

In determining a settlement's fairness, the Court considers: "(1) the posture of the case at the time settlement was proposed; (2) the extent of discovery that had been conducted; (3) the circumstances surrounding the negotiations; and (4) the experience of counsel in the area of [the] class action litigation." *Lumber Liquidators*, 952 F.3d at 484 (citing *Jiffy Lube*, 927 F.2d at 159). "The fairness analysis is intended primarily to ensure that a 'settlement [is] reached as a result of good-faith bargaining at arm's length, without collusion.'" *Berry v. Schulman*, 807 F.3d 600, 614 (4th Cir. 2015) (citing *Jiffy Lube*, 927 F.2d at 159); *see also Edelen v. Am. Residential Servs., LLC*, Civ. No. DKC 11-2744, 2013 WL 3816986, at *8 (D. Md. July 22, 2013) ("The 'fairness' prong is concerned with the procedural propriety of the proposed settlement agreement"); Rule 23(e)(2)(B).

The Court concludes that all factors weigh in favor of finding the settlement is fair. The settlement was reached as a result of good-faith bargaining at arm's length without collusion; nothing in the record suggests otherwise. The posture of the MDL and the extent of discovery weigh in favor of this finding: this MDL has been, and continues to be, vigorously litigated by all parties, and the Parties only reached a settlement regarding PWS after extensive discovery was completed and summary judgment and motions in limine were ruled on in *City of Stuart* and after 3M and DuPont entered PWS settlements. Further, settlement only occurred with the help of a court-appointed mediator, Judge Layn Phillips (Ret.), and only after years of negotiation. Last, Class Counsel are undoubtedly experienced and highly qualified mass tort litigators.

### b. Adequacy

In assessing the adequacy of a proposed settlement, the Court considers: "(1) the relative strength of the plaintiffs' case on the merits; (2) the existence of any difficulties of proof or strong

defenses the plaintiffs are likely to encounter if the case goes to trial; (3) the anticipated duration and expense of additional litigation; (4) the solvency of the defendant[ ] and the likelihood of recovery on a litigated judgment; and (5) the degree of opposition to the settlement." *Lumber Liquidators*, 952 F.3d at 484 (citing *Jiffy Lube*, 927 F.2d at 159). "The most important factors in this analysis are the relative strength of the plaintiffs' claims on the merits and the existence of any difficulties of proof or strong defenses." *Sharp Farms v. Speaks*, 917 F.3d 276, 299 (4th Cir. 2019). The focus of the adequacy prong is "the agreement's substantive propriety." *Edelen*, 2013 WL 3816986, at *8 (citations and quotations omitted); Rule 23(e)(2)(C).

The Court concludes that the proposed settlement is adequate. The first two factors—the relative strength of Plaintiffs' case on the merits and the existence of any difficulties of proof or strong defenses the Plaintiffs are likely to encounter if the case goes to trial—support this finding. While Plaintiffs are confident in the strength of their allegations and supporting evidence, so are Defendants. *See* Declaration of Court-Appointed Mediator Layn Phillips, (Dkt. No. 4911-8) ("To the extent that the settlement negotiations were difficult and contentious, that was because all involved held firm to their convictions that they had the strong factual and legal arguments on issues relevant to liability, damages and otherwise, leading to robust debates on virtually every aspect of the settlement, including the ultimate outcome of motions, trials, and appeals, if a negotiated agreement was not achieved."). As all serious counsel must admit, "[p]laintiffs' ability to prevail on the merits is uncertain. The Settlement confers relief that might well not be achievable through continued litigation." *Gray v. Talking Phone Book*, 2012 U.S. Dist. LEXIS 200804, at *16 (D.S.C. Aug 20, 2012).

The third and fourth factors—the anticipated duration and expense of additional litigation and Defendant's solvency—also favor of settlement. If not approved, Settlement Class Members would be years—if not a decade—away from litigating and reaching finality in their own cases

despite the likely need to "comply with the newly promulgated EPA MCLs for PFAS." (Dkt. No. 6165-1 at 56). Further, preparing an individual case for trial would require engaging expert witnesses "at a cost totaling hundreds of thousands of dollars," and any judgment for a Class Member would be subject to lengthy appeals while the Settlement Agreement provides immediate results and benefits to Settlement Class Members. (*Id.* at 55-58). Also, though there is no indication Defendant is insolvent, other defendants in this MDL have filed for bankruptcy because of this litigation. *See* Suggestion of Bankruptcy for Kidde-Fenwal, Inc., (Dkt. No. 3122) (noting assets in the $100-$500 million range and liabilities in the $1,000,000,001 to $10 billion range). The potential inability to pay litigated judgment weighs in favor of the adequacy of finally approving the settlement.

The lack of substantive opposition to the Settlement Agreement also weighs in favor of finding it adequate. Of roughly 5,201 identified Settlement Class Members, only 258 PWS on the class notice list submitted requests for exclusions, representing 4.9% of the class. Additionally, only 5 PWS filed objections. As discussed *infra*, these objections are largely duplicative and, more importantly, lack merit. The Court thus finds the degree of opposition to the Settlement Agreement small. Accordingly, this factor weighs in favor of approval. *See, e.g.*, *McAdams v. Robinson*, 26 F.4th 149 (4th Cir. 2022) (affirming district court's approval of a settlement where only 0.04% of the class objected); *Herrera v. Charlotte Sch. of Law, LLC*, 818 Fed. App'x. 165 (4th Cir. 2020) (affirming district court's approval of settlement where only 4% of the class objected); *In re The Mills Corp. Securities Litigation*, 265 F.R.D. 246, 257 (E.D. Va. 2009) (noting that "an absence of objections and a small number of opt-outs weighs significantly in favor of the settlement's adequacy.").

### c.  Reasonableness

The Fourth Circuit has not enumerated factors for assessing reasonableness. *1988 Tr. for*

*Allen Child. Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 527 (4th Cir. 2022). However, it has "suggested that assessing whether a class settlement is 'reasonable' involves examining the amount of the settlement." *Id.* (citing *Sharp Farms v. Speaks*, 917 F.3d 276, 303–04 (4th Cir. 2019)). "To the extent that reasonableness does any work not already performed by one of the other Rule 23(e)(2) requirements, [ ] it at least ensures that the amount on offer is commensurate with the scale of the litigation and the plaintiffs' chances of success at trial." *Id.* The Fourth Circuit has "never required [ ] an estimate" of what the class members would have received had they prevailed at trial. *McAdams*, 26 F.4th at 160. Further, the Court is not required to "decide the merits of the case nor substitute its judgment of what the case might be worth for that of class counsel," rather "the court must at least satisfy itself that the class settlement is within the 'ballpark' of reasonableness." *Id.* (quotations and citations omitted).

The pertinent agreement is the Settlement Agreement, Rule 23(e)(2)(C)(iv), under which Defendants will pay $750 million to settle the claims of roughly 12,000 PWS across the United States.

The Settlement Amount will be distributed through the Allocation Procedures, which rely principally on flow rates and degree of PFAS contamination in each system to calculate the final Allocated Amount. (Dkt. No. 6165-1 at 42); *see* Rule 23(e)(2)(C)(ii).

As to attorneys' fees, Class Counsel has moved, by separate motion, for 8% of the Settlement Amount in Class Counsel Fees. (Dkt. No. 5379). Though the Court will address an award of attorneys' fees later, it bears noting that no party objected to Class Counsel's request for attorneys' fees and that the Settlement Agreement itself does not provide a set amount or even a range of attorneys' fees, placing the matter entirely into the Court's hands for determination.

The Court finds that the Settlement Agreement is reasonable. *See* Rule 23(e)(2)(C)(i). As discussed at length above, success against Defendants is not guaranteed and would only come, if

ever, after years of protracted, expensive, complex litigation. The Settlement Agreement provides money not only to parties already affected by PFAS, but to those which may be so affected soon. The Settlement Agreement implements Allocation Procedures objectively derived from flow rates of Impacted Water Sources and PFAS concentrations which will be employed to allocate funds among Eligible Class Members under the guidance of the Court-Appointed Claims Administrator, himself under the oversite of the Court-appointed Special Master. The Settlement Agreement treats class members equitably relative to each other based on objective criteria, *see* Rule 23(e)(2)(D), and the fact the parties did not set attorneys' fees or even a range of fees weighs in favor of finding the Settlement Agreement is reasonable. *See Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 845 (E.D. La. 2007) (noting that "[b]ecause the parties have not agreed to an amount or even a range of attorneys' fees, and have placed the matter entirely into the Court's hands for determination, there is no threat of the issue explicitly tainting the fairness of settlement bargaining").

### d. Objections to the Settlement Agreement

The Court now addresses objections filed by Class Members regarding whether the Settlement Agreement satisfies Rule 23(e). (Dkt. Nos. 5759 and 5767).

Four objectors, Metropolitan Water District ("Met Water"), Lakewood Water District, City of Airway Heights, and City of Vancouver—are represented by a single law firm, Marten Law LLP ("Marten Law"). (Dkt. No. 5767). Marten Law largely repeats objections it raised to the 3M and DuPont PWS settlements, which are nearly identical to this Settlement Agreement. The Court overruled Marten Law's objections to the 3M and DuPont PWS settlements. *In re Aqueous Film-Forming Foam Prods. Liab. Litig.*, No. 18-2873, 2024 WL 1341122, at *9 (D.S.C. March 29, 2024). Widefield Water filed a separate objection that overlaps with Marten Law's (Dkt. No. 5759).

Marten Law argues the release is overbroad because it includes (a) claims as to PFAS that have not yet entered drinking water and PFAS in newly established or yet-to-be-developed water sources; (b) wastewater, stormwater, and real property cleanup claims; (c) claims for unknown PFAS for which no claims are asserted in litigation; and (d) indemnity and contribution for personal-injury claims. (Dkt. No. 5767 at 2-8).

For point (b), Marten Law argues that the Release is overbroad because Section 12.1.2 only excludes from the release claims involving wastewater, stormwater, and real property that is physically separate from a class member's PWS. Marten Law argues that "even a remote physical relationship" would negate the provisions excluding real property, stormwater, and wastewater claims from the Release. (*Id.* at 5).

The Settlement Agreement states it is intended to address "Public Water Systems' Claims regarding alleged PFAS-related harm to Drinking Water and associated financial burdens, including Public Water Systems' potential costs of monitoring, treating, or remediating PFAS in Drinking Water." (Dkt. No. 4911-3 at 1). While the Settlement Agreement releases claims arising from or related to "PFAS that has entered or may reasonably be expected to enter Drinking Water or any Releasing Party's Public Water System," Sections 12.1.2.1 and 12.1.2.2 exclude from Released Claims a PWS's Claims related to treatment of a Class Member's PFAS-contaminated real property, stormwater system, or wastewater system that is "separate from and not related in any way to the Class Member's [PWS,]" does not arise from PFAS in PWS, and seeks relief unrelated to Drinking Water, its Public Water System, or its Water Sources. (*Id.* at 31-32). The Settlement Agreement's interpretive guidance states "[i]t is the parties' joint understanding that the words 'separate from' and 'not related in any way to' in [Paragraphs 12.1.2.1 and 12.1.2.2] mean 'separate from and not physically related to.'" (*Id.* at 178).

Given the types of claims the Settlement Agreement aims to resolve and the definition of

"separate from," specifically that it is grounded in physical connection, the Court finds that the language promotes the Parties' intent of barring double recovery. Accordingly, the Court overrules objections as to point (b).

The Court addresses points (a) and (c) together. For point (a), Marten Law argues that the Release improperly encompasses claims for PFAS that may be reasonably expected to enter water supplies in the future. (Dkt. No. 5767 at 2). Marten Law argues that these claims fall outside the factual and temporal predicate of the claims alleged against Defendant. (*Id.*) For point (c), Marten Law and Widefield Water argue that because the Settlement Agreement releases claims for various types of PFAS, it is unreasonable. (Dkt. No. 5767 at 5-6); (Dkt. No. 5759 at 5-7).

The Settlement Agreement defines "PFAS" to mean "any per- or poly-fluoroalkyl substances that contains at least one fully fluorinated methyl or methylene carbon atom". (Dkt. No. 4911-3, ¶ 2.47). The Settlement Agreement also releases Claims that "may arise at any time in the future out of, relate[] to, or involve[] the development, manufacture, formulation, distribution, sale, transportation, storage, loading, mixing, application, or use of PFAS or any product (including AFFF) manufactured with or containing PFAS (to the extent such Claim relates to, arises out of, or involves PFAS)." (Dkt. No. 4911-3, ¶ 12.1.1). Marten Law and Widefield Water argue that the Settlement Agreement cannot properly release claims related to all forms of PFAS because the released claims lack an identical factual predicate with this litigation.

A court can approve a release of claims that share an "identical factual predicate" with claims alleged in a case. *Berry v. Schulman*, 807 F.3d 600, 616 (4th Cir. 2015). Claims have an "identical factual predicate" when they "depend[ ] upon the very same set of facts." *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982) (quoting *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 n.7 (2d Cir. 1981)).

The Court finds that future claims share an identical factual predicate with the Released

Claims. The Settlement Agreement provides PWS with compensation to treat PFAS-contaminated Drinking Water. Once a PWS has been compensated to treat its Drinking Water, it will have waived its right to make claims for damages to treat its Drinking Water. Accordingly, releasing future claims that were reasonably expected to enter the water, protects against double recovery and promotes finality.

Similarly, the Court finds that the release of claims for unknown PFAS shares an identical factual predicate with those for the release of PFOS and PFOA. The release of claims for all types of PFAS arises from allegations that Defendants knew of the environmental and potential human health risks associated with exposure to PFAS, yet continued to develop, manufacture, distribute, and sell PFAS and products containing PFAS. Additionally, as Class Counsel observes, the compensation provided by the Settlement Agreement is directly tied to the cost of treating such contamination and, regardless of the type of PFAS present in a Water Supply, "treatment [is] by the same method[]." (Dkt. No. 6165-1 at 76-78). Here, there is no fundamental element lacking between releasing claims for PFOS and PFOA and all types of PFAS. The release sought by the Parties is commensurate with the Settlement Amount, the Parties' desire to avoid double recovery, and the Parties' need for finality.

As to point (d), the Court rejects the contention that the Settlement Agreement improperly "releases" personal injury claims. PWS are not natural persons and cannot have personal injury claims of their own. The Release provisions described above do not purport to release any individual's personal injury claims. Contentions to the contrary knowingly distort the text of the Settlement Agreement and objections on this basis are overruled.

The Settlement Agreement does, however, require Releasing Parties to release contribution and indemnity claims against Defendants if the PWS is the subject of suits by injured individuals for personal injury claims. (*Id.* at 36). Such a release is common, however, in class action suits and

objectors point to no case law holding that such a provision precludes a Court from finding a settlement is fair, adequate, or reasonable. *Caudle v. Sprint/United Management Company*, 2019 WL 2716291, at *4 (N.D. Cal., 2019) (approving release of indemnity claims arising from claims that are part of settlement); *Rieckborn v. Velti PLC*, 2015 WL 468329, at *10 (N.D. Cal., 2015) (same); *see also In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 366 (3d Cir.2001) ("It is now settled that a judgment pursuant to a class settlement can bar later claims based on the allegations underlying the claims in the settled class action."). To the extent a PWS believed the risk of suits such as those described above outweighed the utility of the Settlement Agreement, such PWS was free to opt-out. At bottom, this objection is less a challenge under Rule 23(e)(2) to the Settlement Agreement than a qualitative disagreement with the Settlement Agreement couched as a legal objection.

In addition to arguing that the Release is too broad, Marten Law also argues that the Releasing Parties definition is unreasonable.

The pertinent language is Section 2.55 which defines "Releasing Parties" to include Class Members, their representatives, any Person acting on behalf of a Class Member, including in a representative or derivative capacity, and any Person that has authority to bring a claim on behalf of the Class Member. (Dkt. No. 4911-3 ¶ 2.63). "[C]lass action settlements have in the past released claims against non-parties where, as here, the claims against the non-party being released were based on the same underlying factual predicate as the claims asserted against the parties to the action being settled." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 109 (2d Cir. 2005) (citing *In re Lloyd's Am. Trust Fund Litig.*, 2002 WL 31663577, at *11 (S.D.N.Y. Nov. 26, 2002)); *see In re Holocaust Victim Assets Litig.*, 105 F.Supp.2d 139, 143, 160–65 (E.D.N.Y.2000) (approving class settlement with broad releases against non-parties, including insurance carriers, other banks, and Swiss governmental entities); 4 Alba Conte & Herbert B. Newberg, Newberg on

Class Actions § 12:16, at 318 (4th ed. 2002) ("A settlement may . . . seek to discharge parties who have not been served with process and are therefore not before the court.").

In *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Prods. Liab. Litig.*, to prevent against double recovery, the definition of releasing parties included not only the settlement class member Volkswagen dealers, but "any other legal or natural persons who may claim by, through, or under them." MDL No. 2672 CRB (JSC), 2018 WL 1588012, at *8 (N.D. Cal., 2018). Such scope—maybe broader than the language here—was permissible on the logic that "[b]ecause the Intervenor Plaintiffs each assert claims 'by, through, or under [the class members],' they are Releasing Parties under the settlement agreement." *Id.* (internal citations omitted).

The Court overrules objections on this point. As the above cases demonstrate, the fact the Release releases claims against nonparties does not render the Settlement Agreement per se unreasonable. At bottom, to avoid double recovery, the "Releasing Parties" must necessarily include those who may have a stake in recovery.

Marten Law also argues that the Release and Releasing Parties definitions are overbroad because the Settlement Agreement could "extend to water providers that have opted out." (Dkt. No. 5767 at 12). Specifically, Marten law is concerned that an opt-out wholesaler's claim would be released if its retail customer remains a Class Member. (*Id.*) The Parties Interrelated Guidance addresses this situation directly: "In general, if a wholesaler opts out of the Settlement Class and its retail customer is a Class Member, the release would extend to the wholesaler as to the water it provided to the Class Member except to the extent the wholesaler shows it had the obligation for and bore unreimbursed PFAS-treatment costs for that water independent of the retail customer." (Dkt. No. 4911-3 at 170). Further, Section 9.7.1 states that "[a]ny Eligible Claimant that submits a timely and valid Opt Out shall not (i) be bound by this Settlement Agreement . . . ." (*Id.* at 24). The Court finds that these provisions of the Settlement Agreement address Marten Law's concern

and preserve an opt out wholesaler's claim even if its retail customer is a Class Member. For example, an opt-out wholesaler that pays treatment costs for its Impacted Water Source would have a claim for at least a portion of its treatment costs even if one of its retail customers is a Class Member. Accordingly, the Court overrules this objection.

Marten Law further argues that the Settlement Agreement overlooks the challenges of PFAS treatment at scale. (Dkt. No. 5767 at 13-14). Marten Law argues that Class Counsel did not consider the real-life costs for PFAS treatment for large water systems and provided an example that the estimated costs for Met Water to implement a treatment plan would be more than $8 billion. (*Id.*) But Class Counsel's sworn declaration states that, in developing the Allocation Procedures, Drs. Trapp and Chavan were instructed to use "factors that real-world engineers would consider in calculating treatment costs for PFAS compounds . . . ." (Dkt. No. 4911-4, ¶ 14). Moreover, when analyzing the adequacy of the Settlement Agreement under *JiffyLube* above, the Court found that all five factors weighed in favor of adequacy. The Court therefore overrules this objection.

Marten Law argues that the Claims Form Certification is unreasonable because it requires a Class Member to certify that it "has consulted with any other entity that has incurred costs in connection with efforts to remove PFAS from, or prevent PFAS from entering, Class Member's Public Water System, and that Class Member's claim is on behalf of any such other entity" (Dkt. No. 4911-3 at 68). Marten Law argues that this requirement is unreasonable because it could require consultation with thousands of PWS that use water from a single water source. (Dkt. No. 5767 at 15). The Court disagrees with Marten Laws' interpretation of the Claims Form. The Claims Form merely requires a Class Member to consult with any other entities that have incurred PFAS-related costs for the Class Member's Water System. The language does not cover the situation Marten Law describes. Accordingly, the Court overrules this objection.

Marten Law argues that the Effective Date and Final Judgment could have been defined to

occur earlier. Effective Date is defined as "the date that occurs five (5) Business Days after the date of Final Judgment." (Dkt. No. 4991-3, ¶ 2.21). Final Judgment definition provides that, "if appealed, approval of this Settlement has been affirmed by the court of last resort to which such appeal (or petition for a writ of certiorari) has been taken and such affirmance has become no longer subject to further review . . . or the appeal or petition is voluntarily dismissed." (*Id.*, ¶ 2.28). Marten Law argues that the current definitions make it more difficult to object and press objections on appeal because any potential appeal would be met by Class Counsel's accusation that the appellant is holding up significant payments to thousands of deserving Class Members. Marten Law suggests allowing claims administration to proceed as soon as the Court enters final judgment, with an appeal having an impact only if it results in a stay or reversal of final approval based on core issues like class certification. (Dkt. No. 5767 at 16). The Court finds that the Settlement Agreements' definitions provide the parties finality and agrees with Class Counsel that a corporation likely would not "agree to commit to and implement a multi-million-dollar settlement without any assurance that it would reach fruition through an iron-clad final judgment that is no longer the subject of any possible appeal" (Dkt. No. 6165 at 75). Accordingly, this objection is overruled.

Marten Law lastly argues that the Settlement Agreement's Wavier of Objection Provision is unfair. (Dkt. No. 5767 at 17). The provision provides that the "withdrawal of a Request for Exclusion does not permit a Person to . . . revive previously asserted objections." (Dkt. No. 4911-3, ¶ 9.7). Marten Law argues a party that objects to the settlement and then subsequently opts out of the settlement should be permitted to resuscitate its objection if it withdraws its request for exclusion. Marten Law does not provide any authority suggesting this provision is unfair or unreasonable. The Court agrees with Class Counsel that a corporation likely would not "agree that [a] party may flip-flop on legal positions without any estoppel" (Dkt. No. 6165 at 75). The Court

finds this objection is meritless and overrules it.

### Conclusion

For the reasons stated above, the Court

- **FINDS** that the Settlement Agreement is fair, reasonable, and adequate;

- **FINDS** that, for settlement purposes only, the Settlement Class satisfies the requirements of Fed. R. Civ. P. 23;

- **GRANTS** Class Counsel's motion for final approval of class settlement and final certification of the settlement class (Dkt. No. 6165); and

- **ENJOINS** any Settlement Class Member from asserting or pursuing any Released Claim against any Released Person in any forum.

**AND IT IS SO ORDERED**

November 22, 2024
Charleston, South Carolina

s/Richard M. Gergel
_____
Richard M. Gergel
United States District Judge